In the

# United States Court of Appeals
## for the Seventh Circuit

No. 23-1231

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOSE REYNA,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:21-CR-41 — **Robert L. Miller, Jr.**, *Judge.*

ARGUED NOVEMBER 1, 2023 — DECIDED JANUARY 28, 2026

Before SYKES, ST. EVE, and LEE, *Circuit Judges.*

SYKES, *Circuit Judge.* Jose Reyna pleaded guilty to possessing a firearm with an obliterated serial number in violation of 18 U.S.C. § 922(k). Just before sentencing he moved to dismiss the indictment, arguing that § 922(k) is an unconstitutional infringement of his Second Amendment right to keep and bear arms under the Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

*Bruen* established a new standard for assessing the constitutionality of restrictions on weapons-related conduct: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24.

The Court issued *Bruen* before Reyna pleaded guilty, and his motion was otherwise untimely under the district court's scheduling order. But the judge found good cause to entertain the belated motion and denied it on the merits. He rejected Reyna's claim at *Bruen*'s first step, holding that the Second Amendment's text does not cover possession of a deserialized firearm. Reyna asks us to reverse that decision.

We affirm the judgment, though on somewhat different reasoning. *Bruen*'s first step is explicitly framed as a plain-text inquiry. Like most other provisions in the Bill of Rights, the Second Amendment is expressed in broad and highly general language; we're not confident that the text alone resolves this case. Still, we agree that § 922(k) is not unconstitutional. The Court clarified *Bruen* in *United States v. Rahimi*, 602 U.S. 680 (2024), explaining that the new decision method should not be misunderstood to mean that modern regulations are invalid unless a close analogue in founding-era legal history can be identified. Instead, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692.

Under *Rahimi*'s refinement of *Bruen*, § 922(k) is a valid firearm regulation. Although the modern requirement of serialization lacks a precise analogue in our early history, it

is loosely but relevantly similar to founding-era laws and practices requiring firearms to be marked or stamped, inventoried, and inspected in furtherance of military service or militia readiness. We hold that § 922(k) is consistent with the principles underlying this tradition.

## I. Background

Reyna was arrested in the early morning hours of February 17, 2021, during a traffic stop in South Bend, Indiana. A police officer stopped him at around 2 a.m. for a headlight violation and smelled marijuana in his vehicle. Reyna did not have a driver's license, so the officer detained him and searched the car, recovering several bags of marijuana, distribution quantities of methamphetamine, and a loaded handgun with an obliterated serial number. Reyna admitted that he was dealing drugs from his car and kept the gun to protect his business. He also told the police that he had scratched off the gun's serial number and fired it on two occasions to scare off would-be robbers.

A grand jury returned an indictment charging Reyna with a single crime: possession of a firearm with a removed, altered, or obliterated serial number in violation of § 922(k). He pleaded guilty without a plea agreement. Two days before sentencing, he moved to dismiss the indictment, arguing that § 922(k) is an unconstitutional restriction on the Second Amendment right to keep and bear arms. His motion raised a facial challenge to the statute under the Supreme Court's decision in *Bruen*.

*Bruen* was already on the books when Reyna pleaded guilty, and his eleventh-hour motion was untimely under the district court's scheduling order. *See* FED. R. CRIM.

P. 12(c)(1). But the judge found good cause to consider the late motion, explaining that if the constitutional challenge was successful, it would give Reyna a just reason to withdraw his plea. *See id.* r. 12(c)(3) (providing that the court may consider an untimely pretrial motion on a showing of good cause); *id.* r. 11(d)(2)(B) (providing that a guilty plea may be withdrawn for a fair and just reason). The government has not challenged that procedural ruling.

The judge then denied Reyna's motion on the merits, rejecting the constitutional claim at step one of the *Bruen* framework. He agreed with the government's position that possessing a firearm with an obliterated serial number is not covered by the plain text of the Second Amendment because deserialized firearms are not typically used by law-abiding citizens for lawful purposes. The judge expressly declined to address the government's argument at step two of *Bruen* that § 922(k) is consistent with our nation's historical tradition of firearm regulation.

With that, the case moved forward to sentencing, and this appeal followed.

## II. Discussion

The sole issue before us is Reyna's Second Amendment challenge to § 922(k). He maintains, as he did in the district court, that the statute is unconstitutional on its face. A facial challenge is the most difficult kind of constitutional claim to raise successfully: to prevail Reyna must establish that "no set of circumstances exists" under which § 922(k) is valid. *Rahimi*, 602 U.S. at 693 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). We review the constitutionality of

the statute de novo. *United States v. Johnson*, 42 F.4th 743, 746 (7th Cir. 2022).

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In its foundational decision in *District of Columbia v. Heller*, the Supreme Court confirmed that the Amendment secures an individual right to keep and bear arms, not merely a collective right limited to military or militia service. 554 U.S. 570, 592–95 (2008).

"Derived from English practice and codified in the Second Amendment, the right secures for Americans a means of self-defense." *Rahimi*, 602 U.S. at 690. Like other individual rights, however, "the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626.

*Heller* did not, of course, "undertake an exhaustive historical analysis" of the limits on the scope of the Second Amendment right or the extent of the government's authority to regulate it where it applies. *Id.* After examining the Amendment's text and history, the Court held that it codifies a preexisting individual right not limited to militia service, then turned to the specific law in question in the case: the District of Columbia's ban on the possession of handguns, even in the home. The Court found the handgun ban incompatible with the original meaning of the right. *Id.* at 628–30.

Since *Heller* the Supreme Court's Second Amendment cases have centered on the Amendment's text and history to resolve additional questions about the nature and scope of the right and the constitutionality of specific restrictions on it. *See Bruen*, 597 U.S. at 20–24. In *Bruen* the Court made this adjudicative method exclusive, holding that the text and history of the right—not means-end scrutiny or any form of interest balancing—control the entire analysis in all Second Amendment challenges to weapons-related regulations. *Id.* at 22–24.

The Court framed the new standard as follows: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24.

As we've noted, the district judge resolved Reyna's challenge to § 922(k) at step one of the *Bruen* framework, accepting the government's position that the text of the Second Amendment does not cover possession of deserialized firearms. Reyna contests that conclusion, arguing that it misunderstands the Court's instructions in *Bruen*. And because the judge did not address *Bruen*'s second step, Reyna asks us to reverse and remand the case for the judge to consider the government's historical justification in the first instance.

As expected, the government defends the judge's decision to reject Reyna's claim at *Bruen*'s first step. If we disagree, however, the government argues in the alternative that a remand is unnecessary because the parties briefed the full *Bruen* inquiry below, giving us an adequate record to pro-

ceed to step two. The government maintains, as it did below, that § 922(k) is compatible with our historical tradition of firearm regulation.

The government's historical argument is persuasive, especially after *Rahimi*. We begin, however, by explaining our hesitation that Reyna's claim can be rejected at *Bruen*'s first step based solely on the Second Amendment's text.

## A. Step One of the *Bruen* Framework

The government's position at step one of *Bruen* rests on an assumption that *Heller* conclusively marked the boundaries of the Second Amendment right as a definitional matter, limiting it to only those weapons in common use by law-abiding, responsible citizens for lawful purposes, such as self-defense. From this premise, the government reasons as follows: only criminals possess firearms with obliterated serial numbers; there is no compelling reason for law-abiding, responsible citizens to do so; therefore, because deserialized firearms are not in common use by law-abiding citizens for lawful purposes, possession of a firearm with an obliterated serial number is not covered by the text of the Second Amendment.

The problem with this argument is its underlying assumption, which reads *Heller* as having decided more than it did. *Heller*'s references to weapons "in common use" by "law-abiding citizens" originate in the section of the opinion addressing the stare decisis question—that is, whether any of the Court's precedents foreclosed the conclusion that the Second Amendment codifies a preexisting individual right rather than a narrower collective right limited to militia service. *See Heller*, 554 U.S. at 619–26.

As relevant here, this section of *Heller* responds to Justice Stevens's dissenting view that the Court's 70-year-old decision in *United States v. Miller*, 307 U.S. 174 (1939), authoritatively determined that the Second Amendment protects only a collective right to possess arms in connection with militia service. *Heller*, 554 U.S. at 621–25. Refuting that reading, the *Heller* majority explained that *Miller* was a narrow decision that did not address the nature of the right *at all*. *Id.* at 622–24.

*Miller* involved a challenge to an indictment for possession of a short-barreled shotgun in violation of the National Firearms Act. The district court had quashed the indictment, holding that the statute violated the Second Amendment, but the Supreme Court reversed. *Miller*, 307 U.S. at 177, 183. In a short opinion, the Court focused primarily on the connection between the right and service in the militia or military, noting that "it is not within judicial notice that this weapon [a short-barreled shotgun] is any part of the ordinary military equipment or that its use could contribute to the common defense." *Id.* at 178. The Court held that

> [i]n the absence of any evidence tending to show that the possession or use of a [short-barreled shotgun] at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear *such an instrument*.

*Id.* (emphasis added).

After tracing this background, the *Heller* majority explained that the Court's decision in *Miller* was quite limited

and did *not* hold—indeed, "cannot possibly be read to have held"—that the Second Amendment right is limited to militia service. *Heller*, 554 U.S. at 621. Rather, *"Miller* stands only for the proposition that the Second Amendment right, whatever its nature, extends only to certain types of weapons." *Id.* at 623. Nor did *Miller* suggest that the Amendment protects only weapons useful in military service or, conversely, that restrictions on the personal possession of military weapons—machineguns, for example—might be unconstitutional. *Id.* at 624–25. Instead, as the *Heller* majority explained, *Miller* simply took note of the historical fact that "'ordinarily when called for [militia] service[,] [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time.'" *Id.* at 624 (alterations in original) (quoting *Miller*, 307 U.S. at 179). Reinforcing this point, the *Heller* majority explained that "[t]he traditional militia was formed from a pool of men bringing arms in common use at the time for lawful purposes like self-defense." *Id.* (internal quotation marks omitted).

The *Heller* majority's response to Justice Stevens continued with a litany of reasons not to overread *Miller*: the government's brief had contained only "scant discussion of the history of the Second Amendment"; there had been no adversarial presentation in the case—the defendants did not file a brief or appear at oral argument—so "the Court was presented with no counterdiscussion"; and the decision said "[n]ot a word *(not a word)* about the history of the Second Amendment." *Id.* at 623–24. All this, the *Heller* majority explained, made it unwise to "read *Miller* for more than it said, because the case did not even purport to be a thorough examination of the Second Amendment." *Id.* at 623.

After issuing these cautions and qualifications, the *Heller* majority went on to offer a few observations about generalizations that might fairly be drawn from *Miller*. One such observation was this:

> We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns. That accords with the historical understanding of the scope of the right, see Part III, *infra*.

*Id.* at 625.

The cross-reference to Part III of the opinion sends the reader to a brief discussion explaining that the Second Amendment right has limits (like most other rights) and mentioning a few. *Id.* at 626–27. This part of *Heller* is quite short: just three paragraphs. The first paragraph contains a much-scrutinized passage that has proved vexing for the lower courts.[1]

---

[1] In its brief discussion of limits on the Second Amendment right, the Court said this:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*District of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008).

The second paragraph returns to *Miller* with this brief comment:

> We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those "in common use at the time." We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons."

*Id.* at 627 (citation omitted).

The Court's acknowledgement that the Second Amendment right is not unlimited was unsurprising and leaves much for future consideration—a self-evident point that the Court made explicit at the end of its opinion:

> [S]ince this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field … . [T]here will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us.

*Id.* at 635.

We've unpacked these parts of *Heller* to explain our uncertainty that this case can be resolved at *Bruen*'s first step. The Court's commentary about weapons "in common use" by "law-abiding citizens" rests on its review of precedent (*Miller*), history, and tradition, and it came with significant cautionary qualifications. The Court made clear that its observations about the limits on the right were (1) prelimi-

nary; (2) not based on a comprehensive historical analysis; (3) subject to further exploration in future cases; and (4) unnecessary to its holding.

Indeed, earlier in *Heller*, in the heart of its exploration of the meaning of the Second Amendment right—specifically, the meaning of the term "arms"—the Court explained that the Amendment "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582. *Rahimi* and *Bruen* repeat this point. *Rahimi*, 602 U.S. at 691; *Bruen*, 597 U.S. at 28 (explaining that "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense").

In short, absent further signals from the Court about the *Bruen* step-one inquiry, it's hard to say with confidence that the conduct regulated by § 922(k) is categorically outside the prima facie scope of the right. For these reasons, we do not share the government's certainty that Reyna's challenge to § 922(k) can be resolved at *Bruen*'s first step without consulting founding-era legal history.

The *Bruen* standard is still in its early days. It's no surprise that difficult theoretical questions remain about how to evaluate its dual components of constitutional text and history. For present purposes, we think it's best to assume that possession of a deserialized firearm is not categorically excluded from the scope of the right and consider whether § 922(k) is consistent with our historical tradition of firearm regulation. We forge ahead to that question.

**B. Step Two of the *Bruen* Framework**

*Bruen*'s second step requires the government to demonstrate that § 922(k) is consistent with the Nation's historical tradition of firearm regulation. As we've noted, in *Rahimi* the Court clarified that the *Bruen* standard should not be misunderstood to mean that modern firearm regulations require close founding-era comparators. 602 U.S. at 691–92. The Court punctuated the point this way: *Heller* and *Bruen* "were not meant to suggest a law trapped in amber." *Id.* at 691. Rather, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 692. The analysis examines "whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Id.* (quoting *Bruen*, 597 U.S. at 29).

Although systemic firearm serialization as it exists today was not in use when the Second Amendment was ratified, founding-era regulations established various measures to inventory and track firearms. For example, starting in the early seventeenth century, Virginia required plantation commanders to take a yearly account of "arm[]s and munition." Virginia Act of Mar. 2, 1631, Act. LVI, *reprinted in* 1 The Statutes at Large, Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619, at 174–75 (William Waller Hening ed., N.Y., R. & W. & G. Bartow 1823); *see* Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55, 76 (2017). Similarly, in the mid-seventeenth century, Rhode Island required by governor's order a lieutenant to go from house to house "tak[ing] a precise and exact account of all the

arm[]s, am[m]unition[,] and weapons … each person is furnished with." 2 RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 196 (John Russell Bartlett ed., Providence, R.I., A. Crawford Greene & Brother 1857).

By the time the Second Amendment was ratified, it was common practice for states to conduct musters to keep track of firearms for militia purposes. *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & HIST. REV. 139, 161 (2007). In the mid-eighteenth century, South Carolina adopted a law authorizing its military officers to go door to door to view and inspect any arms and ammunition with a penalty of three pounds for refusing inspection or possessing noncompliant arms. An Act for the Better Regulating the Militia of this Province, § 10 (1747), *reprinted in* 9 THE STATUTES AT LARGE OF SOUTH CAROLINA app. at 647 (David J. McCord ed., Columbia, S.C., A.S. Johnston 1841). New Jersey similarly required militia officers to go door to door at militiamen's homes three times a year to report on the "[s]tate of [their] arms … and [a]mmunition"; it separately required its militia to assemble twice a year to likewise report the state of arms and ammunition. An Act for the Regulating, Training, and Arraying of the Militia, and for Providing More Effectually for the Defence and Security of the State, ch. 242, §§ 13, 15 (1781), *reprinted in* ACTS OF THE GENERAL ASSEMBLY OF THE STATE OF NEW-JERSEY 169–70 (Trenton, Isaac Collins 1784).

Massachusetts similarly required an annual assembly to "examin[e] and tak[e] an exact account of every man['>]s arms and equipment[]" with a fine for militiamen who were

absent. An Act for Regulating and Governing the Militia of the Commonwealth of Massachusetts, ch. 14 (1793), *reprinted in* ACTS AND LAWS OF THE COMMONWEALTH OF MASSACHUSETTS 394–95 (Boston, Wright & Potter Printing Co. 1895). The early Congress enacted a law requiring state militia officers to report the "situation of the arms, accoutrements, and ammunition of the several corps"; those reports were collected and sent to the President of the United States. Act of May 8, 1792, ch. 33, 1 Stat. 271, 273–74.

Meanwhile, our early regulatory tradition also required the marking of firearms. For example, during the Revolutionary War, George Washington required all military equipment, including firearms, to be stamped with an insignia to keep track of firearms and prevent theft. E. WAYNE CARP, TO STARVE THE ARMY AT PLEASURE 67 (1984).

By the early 1800s, some states required gun barrels to be proved and marked (and penalized obliterating the marks). For example, an 1805 Massachusetts law established an inspection process (called "proving") for "all [m]usket [b]arrels and [p]istol barrels" manufactured in the Commonwealth and required inspectors to stamp compliant firearms with their initials, the year of the inspection, and the letters "P" and "M." An Act to Provide for the Proof of Fire Arms Manufactured Within this Commonwealth, ch. 81 (1805), *reprinted in* ACTS AND LAWS OF THE COMMONWEALTH OF MASSACHUSETTS 111–12 (Boston, Wright & Potter Printing Co. 1898). These markings were to be "so deeply impressed" that they "[could] not be erased or disfigu[]red." *Id.* at 112. Anyone who manufactured or sold a firearm without having it inspected and stamped (or "proved," in the language of the statute) was subject to a 10-dollar fine, and anyone who

falsely forged or altered the stamp was subject to a fine of 20 to 50 dollars. *Id.* at 112–13.

Maine enacted a similar law in 1821, requiring "provers" to "mark and number every barrel" in a "permanent manner" and to provide a certificate attesting to the proof with their initials and the date. 1821 Me. Laws 685. Anyone who sold an unproved firearm was subject to a 10-dollar fine, and anyone who falsely altered the stamp or mark on the certificate was subject to a fine of 20 to 100 dollars. *Id.* at 685–86.

These founding-era laws and practices show that marking, inventorying, or otherwise publicly tracking firearms is part of our historical tradition of firearm regulation. Of course, our modern system of firearm serialization is far more sophisticated and comprehensive, but it fits comfortably within this tradition. It follows that § 922(k), which punishes the knowing possession of a deserialized firearm, is likewise consistent with this tradition—in principle, if not specifics. In *Bruen*'s framing, as refined by *Rahimi*, § 922(k) is "relevantly similar" to founding-era regulations requiring firearms to be inventoried, inspected, or marked to promote militia readiness and permit public tracking of firearms. *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29).

*Rahimi* confirmed that a closer match to a historical precursor is not necessary. 602 U.S. at 691. The founding-era laws establishing public inventory and inspection regimes and rudimentary forms of firearm marking ensured that the relevant governing authority could monitor and track firearms within its jurisdiction, penalizing those who did not comply. It's true that some of the historical regulations were linked to militia preservation and readiness. But "the Second Amendment permits more than just those regulations iden-

tical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers." *Rahimi*, 602 U.S. at 691–92. Accordingly, we hold that § 922(k) is compatible with the Second Amendment.

In closing, we note that two of our sister circuits have also upheld the validity of § 922(k) since *Bruen*, though their reasoning differs from ours. The Second and Fourth Circuits have rejected challenges to § 922(k) at step one of *Bruen*, agreeing with the government's position that possession of a deserialized firearm is not covered by the Second Amendment's text. *See United States v. Gomez*, 159 F.4th 172, 177–78 (2d Cir. 2025); *United States v. Price*, 111 F.4th 392, 402–08 (4th Cir. 2024) (en banc). Though our analysis diverges, our conclusion is the same.

AFFIRMED